**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAWN SCHNEIDER-WUENOCH,** | ) | **CASE NO. 1:10CV2774** |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE JUDGE GREG WHITE** |
| v. | ) | |
| **COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,** | ) ) ) | |
| | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff Dawn Schneider-Wuensch (hereinafter referred to as "Schneider"[1]) challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Schneider's claim for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

### I. Procedural History

On August 24, 2007, Schneider filed an application for POD, DIB, and SSI alleging a disability onset date of July 15, 2005, and claiming that she was disabled due to anxiety, back problems, and edema in both legs. (Tr. 27-28, 98.) Her application was denied both initially and upon reconsideration. Schneider timely requested an administrative hearing.

---

[1]The correct spelling of Plaintiff's last name, as indicated in her disability applications, is Schneider-Wuensch. (Tr. 72, 74.) The ALJ also used the "Wuensch" spelling. (Tr 15-26.) This Court refers to her as Schneider, stated to be her preference to the ALJ. (Tr. 1412.)

On January 9, 2009, an Administrative Law Judge ("ALJ") held a hearing during which Schneider, represented by counsel, testified. Ted Macy, an impartial vocational expert, also testified. On June 19, 2009, the ALJ found Schneider was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

*Personal and Vocational Evidence*

Age 41 at the time of her administrative hearing, Schneider is a "younger" person under social security regulations. *See* 20 C.F.R. §§ 404.1563(c)/416.963(c). She has more than a high school education and past relevant work as a server and bartender. (Tr. 24-25.)

*Medical Evidence - Orthopedic Impairments*

Schneider disputes only the portion of the ALJ's decision regarding her orthopedic impairments and limitations.

In February, 2006, a magnetic resonance image ("MRI") was taken of Schneider's lumbar spine, showing minimal degenerative changes at L4-5 with mild left foraminal narrowing, a minimal disc bulge, and mild spinal canal stenosis. (Tr. 333.)

After diagnosis of a painful herniated disc, Konstantine R. Kuschnir, M.D., an orthopedic surgeon, performed a decompression discectomy at L4-5 on June 7, 2006. (Tr. 833.) Dr. Kuschnir advised Schneider not to use her back and not do any extensive bending or any lifting after surgery. (Tr. 833-834.) Over the next year, she continued treatment with Dr. Kuschnir for exacerbated and increased back pain radiating down her legs. (Tr. 830-832.) Medication and epidural blocks were administered in an attempt to reduce her pain. *Id*.

On October 3, 2006, Schneider complained to Dr. Kuschnir of severe back pain. (Tr. 600.) Dr. Kuschnir noted that Schneider was "not a very compliant type patient" and did not go through the physical therapy program. *Id*. Dr. Kuschnir continued to treat her back pain conservatively with medication and epidural blocks. (Tr. 599-600, 633, 830-832.) The doctor encouraged her to exercise in order to tone her back and abdominal muscles. *Id*. On January 31, 2007, Dr. Kuschnir reported that Schneider was able to perform straight leg-raising to 80 degrees

2

bilaterally.[2]  (Tr. 599.)  Her medications were continued on an as-needed basis.  *Id.*

Another MRI of Schneider's lumbar spine was performed on October 18, 2007, because of her continuing complaints of low back pain, radiating down both legs, and leg numbness.  (Tr. 629.)  The MRI showed reversal of the normal lumbar lordotic curve; disc space narrowing at L4-5; degenerative changes at L4-5; increased T2 and STIR signal in the anterior aspect of L4-5 which could represent post surgical changes or disc space infection; mild broad-based bulge or protrusion of the L4-5 disc extending to the right L4-5 foramen with mild foraminal narrowing on the right and possible impingement on the right L4 nerve root, and mild to moderate canal narrowing; mild central and left paramedian disc bulge or protrusion of the L5-S1 disc with a probable annular tear; and, mild enhancement of the L3-4 disc centrally, probably representing an annular tear with mild to moderate canal narrowing.  (Tr. 629-630.)  When compared to the previous study of February 15, 2006,[3] the disc space at L4-5 had become more narrowed, degenerative changes had progressed, the abnormal signal in the disc space had developed, the bulging or protrusion at L4-5 and the material into the L4-5 neural foramen had progressed, and the probable impingement on the right L4 nerve root had also developed.  (Tr. 629-630.)

Dr. Kuschnir continued to treat Schneider with narcotic medication and epidurals throughout 2007 and early 2008 and continued to encourage her to exercise.  (Tr. 830-832.)

On February 27, 2008, due to her progressive pain across her back, down her left leg, and into her foot, Schneider was examined by Rajiv V. Taliwal, M.D., an orthopedic surgeon.  (Tr. 301.)  Dr. Taliwal reported Schneider had a forward stooped posture and normal strength and

---

[2]As explained by the Commissioner in footnote 2, the straight leg-raising test ("SLR") is designed to detect nerve root pressure, tension, or irritation of the sciatic nerve.  (Doc. No. 16 at 3.)  With the knee fully extended, the physician raises the involved leg from the examining table.  A positive SLR test would require reproduction of pain at an elevation of less than 60 degrees.  A positive SLR is the single most important sign of nerve root pressure produced by disc herniation.  Anderson and McNeil, *Lumbar Spine Syndromes*, 78-79 (Springer-Verlag Wein, 1989).

[3]The record actually refers to a previous study dated December 15, 2006, which must be a typographical error as the previous MRI was dated February 15, 2006.  (Tr. 333.)

reflexes, but her SLR was positive on the left. (Tr. 301.) She could not walk on her heels and toes[4], and had a left foot drop. *Id.* Dr. Taliwal noted that Schneider was "on high dose narcotics." *Id*. He diagnosed L4-5 disc degeneration with foraminal stenosis and foot drop. *Id*. He recommended surgery. *Id*. Dr. Taliwal noted: "She needs to be nicotine free before and after surgery. She understands that she does have a problem with medications and we will need to aggressively wean her off of her meds before and then certainly after her surgery." *Id.*

On April 17, 2008, Dr. Taliwal performed a posterior lumbar revision, decompression, and fusion surgery. (Tr. 312-314; 370-372.) She remained hospitalized until April 20, 2008, when she was discharged with a corset brace. (Tr. 377, 379.)

On May 14, 2008, Dr. Taliwal noted that Schneider was making adequate progress, but that she continued to smoke despite his instruction that it posed a high risk for "non-union and pseudoarthrosis." (Tr. 299.) The doctor reported that Schneider tended to slouch, but was able to stand straight when corrected. *Id*. Also, she had 5/5 strength in her legs with some pain inhibition and effort dependent weakness. *Id*. Dr. Taliwal advised her to attend physical therapy two times a week for four weeks. (Tr. 294; 298-299.)

On July 3, 2008, an emergency squad transported Schneider to the Medina General Hospital for complaints of back pain. (Tr. 289.) The paramedics observed Schneider ambulating in her apartment smoking a cigarette. *Id*. They noted that she was able to walk from her second floor apartment to the ambulance. *Id.* She told the paramedics that while bending over that evening, she heard a "pop" and had sudden lower back pain *Id*. She drank a glass of wine and then called the emergency squad. *Id*. She also told them she had not taken any of her pain medications. *Id*. At the emergency room, she was given a narcotic, Dilaudid, a muscle relaxer, and an anti-nausea drug. (Tr. 286.) The report further indicates that Schneider stated she was feeling better – "able to stand and walk." *Id*. She was sent home with two Percocet pills. *Id*.

On July 30, 2008, Dr. Taliwal examined Schneider, who reported that she fell climbing

---

[4]The Commissioner explained in footnote 3 that physicians test toe and heel walking because difficulty with toe walking indicates compromise of the S1 nerve root, while difficulty with heel walking suggests compromise of the L5 nerve root. *Lumbar Spine Syndromes* at 37.

4

the steps a few weeks ago and was transported to the Medina emergency room. (Tr. 360.) She also indicated that she continues to smoke one-half pack of cigarettes per day. *Id*. Dr. Taliwal reported that Schneider was making slow but steady progress. *Id*. Her incision was well-healed and the strength in both legs was 5/5. *Id*. She was able to walk on her heels and toes. *Id*. He again noted that she was using excessive amounts of narcotic medication and needed to "aggressively wean off Kadian and Vicodin." *Id*. Dr. Taliwal noted that she performed better when she was distracted and not paying attention, indicating self-limitation. *Id*. He recommended that Schneider increase her activity as tolerated, and he imposed no restrictions. *Id*.

After attending physical therapy sessions, Schneider again saw Dr. Taliwal on August 8, 2008. (Tr. 296.) Schneider stated that "generally, overall, she is better, however, she still does have bouts of high low back pain with bilateral leg pain." *Id*. The doctor noted that focus will be on increasing Schneider's core stability, as well as increasing her balance to decrease her risk of falling. *Id*. He recommended continued physical therapy. *Id*. The record indicates she attended physical therapy, but not at the prescribed frequency. (Tr. 20; 264-276; 295-296.)

On September 12, 2008, an MRI of Schneider's left knee suggested a medullary bone infarct. (Tr. 340.) An MRI of her right knee, performed on September 21, 2008, showed a bone bruise. (Tr. 336.)

At a follow-up appointment with Dr. Taliwal on November 12, 2008, seven months after surgery, Schneider reported improvement in her back pain, but significant discomfort in her left knee. (Tr. 233.) On exam, Schneider was able to forward flex to well below her knees, but her extension was still a little stiff. *Id*. Her strength was 5/5 in her legs, with a negative SLR bilaterally. *Id*. She had significant tenderness in both knee joints and some increased pain on flexion and extension. *Id*. Dr. Taliwal advised her to continue with activity as tolerated for her lumbar spine. *Id.*

On December 2, 2008, Schneider was examined by Mark M. Musgrave, M.D., an orthopedic surgeon, for pain in her knees. (Tr. 178.) Dr. Musgrave reported Schneider had full range of motion and was neurologically and vascularly intact and ligamentously stable. *Id*. Due

5

to significant pain with palpation of the patellofemoral region with crepitation, Dr. Musgrave administered a cortisone shot. *Id*.

On January 19, 2009, Schneider returned to Dr. Musgrave, complaining, through tears, that pain was always present from her ankle up to her back. (Tr. 173.) Plaintiff's ankle was non-tender. *Id*. She had no swelling and was neurologically and vascularly intact and ligamentously stable. *Id*. Dr. Musgrave recommended physical therapy and pain management. *Id*. He referred Schneider back to Dr. Taliwal as her pain appeared to be radicular in nature. *Id*.

### *Opinion Evidence*

On June 3, 2008, Dr. Kuschnir completed a Medical Source Statement, assessing that Schneider was able to lift/carry ten to fifteen pounds, stand/walk for a total of six hours in an eight-hour workday (for one-half to one hour without interruption), and sit for a total of six hours in an eight-hour workday (for one-half to one hour without interruption). (Tr. 520.) He limited Schneider to rarely climbing, stooping, crouching, kneeling, crawling, and pushing/pulling. (Tr. 521.) He also limited Schneider to no exposure to heights, moving machinery, and temperature extremes. *Id*. He indicated that Schneider would not need more than the typically-scheduled breaks throughout the workday. *Id*. He reported that Schneider had been prescribed a brace, but had not been prescribed a cane, walker, or TENS unit. *Id*. He determined that Schneider needed a sit/stand option and that she experienced "moderate" levels of pain. *Id*.

On June 26, 2008, Dr. Lisa Esterle, M.D., Schneider's treating physician, completed a Medical Source Statement, assessing the following: Schneider could stand/walk for a total of less than one hour in an eight-hour workday, and sit for a total of less than one hour in a workday; Schneider was capable of lifting/carrying less than five pounds (Tr. 365); she could rarely perform any climbing, balancing, stooping, crouching, kneeling, crawling, reaching, handling, feeling, pushing/pulling, fine manipulation, and gross manipulation (Tr. 366); she had environmental limitations to heights, moving machinery, temperature extremes, chemicals, dust, noise, and fumes, *id*.; she needed to rest for periods during an eight-hour workday in addition to her normally scheduled breaks, *id*.; and, she needed a sit/stand option. *Id*.

On July 11, 2008, a non-examining state agency physician, W. Jerry McCloud, M.D.,

6

reviewed Schneider's medical records, noting that she could perform light work that involved lifting and carrying up to twenty pounds occasionally and standing/walking/sitting up to six hours in an eight-hour workday. (Tr. 424-431 at 425.) She could not perform jobs involving climbing of ladders/ropes/scaffolds and crawling. (Tr. 426.) He also noted that Dr. Kuschnir's evaluation of June 3, 2008, was only two months post-surgery and that Schneider would not be so limited four months later. (Tr. 430.)

On December 15, 2008, Dr. Esterle provided a second Medical Source Statement, identical to her earlier assessment, except that she now indicated that Schneider was prescribed a cane and a TENS unit, in addition to a walker, brace, and breathing machine.[5] (Tr. 228).

### *New, Material Evidence Regarding Schneider's Orthopedic Impairments?*

On May 6, 2009, Dr. Taliwal reported that Schneider had developed increasing pain and weakness in both legs. (Tr. 988.) He offered chronic nerve irritation as a possible cause, but was unsure. *Id*.

On July 15, 2009, Schneider was seen by Terence J. Ross, D.O., of Ohio Pain Services, Inc., for pain management. (Tr. 1182.) Dr. Ross reported muscle tightness, diminished extension and rotation, positive SLR on the left, and diminished reflexes. Dr. Ross diagnosed lumbar spinal stenosis and prescribed Vicodin and lumbar epidural injections. (Tr. 1036, 1182, 1185.)

On June 2, 2010, a CT lumbar myelogram was performed, revealing post-surgical changes at L4 and L5; bone graft material at L4/5 with lack of osseous fusion of the L4-L5 vertebral bodies; congenital narrowing of the central canal most pronounced at L3; 3 to 4mm of retrolisthesis of L5 on S1 and to a lesser degree of 3mm at L4 on L5; and, multilevel spondylosis contributing to varying degree of central canal stenosis and neuroforaminal narrowing. (Tr. 1404.)

On July 27, 2010, at a pre-surgical physical exam at University Hospital, Department of

---

[5]The record indicates that Dr. Esterle wrote Schneider a prescription for a cane on August 6, 2007, "due to continuing anxiety disorder." (Tr. 828.)

Orthopaedic Surgery, Schneider reported her functional capacity as follows: "Takes a 10-15 minute walk 3 days/week & exercises 15 minutes daily." (Tr. 1383.)

On August 10, 2010, Schneider underwent a lumbar decompression and L4-S1 PSF. (Tr. 1393.)

### Hearing Testimony

At the hearing, Schneider testified to the following:

- Because the April 2008 surgery did not improve her foot drop, she now has her right foot in a walking cast. (Tr. 1424.)

- For three evenings immediately prior to the hearing, she was in the hospital for pain. (Tr. 1425.)

- Standing causes her pain. *Id*. For instance, she is able to wash dishes and put them away, but then must lay down due to back pain. *Id*.

- She can stand for 10 minutes at a time. *Id*.

- Her leg gives out on her, causing her to fall. (Tr. 1426.) (She showed the ALJ the extensive bruising on her left knee.) *Id*.

- Her pain is almost always at the highest level (10), but then she conceded it may be at level 7. When the pain is bad, she stays in bed and elevates her feet. *Id*.

- She has been prescribed a walker, cane, and back brace, but no knee brace or a TENS unit. (Tr. 1427, 1428.)

- She last had an alcoholic beverage a year prior. (Tr. 1429.)

- She did not know that Dr. Taliwal wanted to get her off of Kadian and Vicodin. *Id*.

- She uses the cane when she walks or shops for groceries. (Tr. 1430.)

### Vocational Expert Testimony

The ALJ posed the following hypothetical to the VE:

Let me propose a hypothetical worker to you, Mr. Macy. This hypothetical worker is 42 years old, has more than a high school education, but no relevant – no currently relevant vocational training. *** Exertionally this hypothetical worker can do a range of sedentary work. And specifically what I mean by that is the hypothetical worker can stand or walk for two hours, sit for six hours during an eight-hour day, lift, carry, push or pull a maximum of 10 pounds all with normal breaks. This hypothetical worker is further limited in that she is precluded from using ladders, ropes and scaffolds. She's precluded from tasks that involve kneeling or crawling. She can occasionally use stairs and ramps. She is limited to simple, routine, low-stress tasks that do not take place in public and do not involve interaction with the public, that involve only superficial interaction with supervisors and coworkers. And she is precluded from tasks that involve

> arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others. * * * My first question is whether this hypothetical worker could do any of the work that Ms. Schneider did in the relevant past?

(Tr. 1414-1415.) The VE testified that such a person would be precluded from performing Schneider's past relevant work. The ALJ next asked the VE to assume that the hypothetical worker has the same work experience as Schneider and determine if there are jobs that such a person could perform. The VE testified that such a worker could perform some sedentary, unskilled jobs, giving some examples, such as a bench assembler, wire worker, or a final assembler. (Tr. 1416-1417.) Positions of bench assembler and wire worker are normally light, unskilled, but there are sedentary positions available. *Id*. The VE noted that at the sedentary level, the bench assembler position represents approximately 400 jobs in Northeast Ohio and 70,000 jobs nationally, while the wire worker position represents approximately 500 jobs in Northeast Ohio and 70,000 nationally. *Id*. The final assembler is sedentary, unskilled with 700 jobs in Northeast Ohio and 100,000 nationally. (Tr. 1417.)

Schneider's attorney inquired if the hypothetical worker would still be able to perform a range of sedentary work if a sit/stand option every fifteen to twenty minutes was added or if the worker needed a cane, walker or walking cast. The VE testified that neither of these limitations would change his answer. (Tr. 1418.) Schneider's attorney next asked the VE to include these same limitations, but changed the sit/stand option to an individual being able to sit up to twenty minutes and stand for up to ten minutes. Again the VE testified these limitations would have no affect. (Tr. 1419-1420.) Schneider's counsel asked the VE to consider all of these limitations, but the individual required an assistive aid to stand, such as a cane. (Tr. 1420.) The VE testified that such an individual could not work without a special accommodation. *Id*.

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

9

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[6]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Schneider was insured on her alleged disability onset date, July 15, 2005, and remained insured through the date of the ALJ's decision, June 19, 2009. (Tr. 15, 26.) Therefore, in order to be entitled to POD and DIB, Schneider must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Schneider established medically determinable, severe impairments, due to herniated lumbar disc after two surgeries, a bone infarct of the left knee, a depressive disorder, a generalized anxiety disorder, and a substance addiction disorder (alcohol); however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R.

---

[6]The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Pt. 404, Subpt. P, App. 1. Schneider was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Schneider is not disabled.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the

11

Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Schneider claims the ALJ erred by: (1) failing to recognize Schneider's need for a sit/stand option and use of a supportive device (cane/walker) in the hypothetical question, resulting in an inaccurate RFC; and, (2) applying improper legal standards in the analysis of Schneider's pain. (Doc. No. 14 at 1.) Schneider also claims that there is new, material evidence which provides good cause for remand. *Id*.

### *Hypothetical Question*

Schneider claims that proper consideration of her treating physicians' opinions prove she is disabled. (Doc. No. 14 at 11-15.) Specifically, Schneider claims the hypothetical question did not include her need to alternate positions (sit/stand option) and to use a cane when standing, which she says are supported by her medical records and her testimony at the hearing. (Doc. No 14 at 13.) The Commissioner contends that the ALJ's hypothetical question accounted for Schneider's credible limitations. (Doc. No. 16 at 12-14.)

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). In fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

The ALJ's hypothetical excluded Schneider's alleged limitations regarding the sit/stand option and her use of a cane/walker as support when standing. The ALJ relied heavily on Dr. Taliwal's opinion and, as the Commissioner argues, there is evidence to support the ALJ's rejection of the more restrictive limitations. Following Schneider's second back surgery, Dr. Taliwal reported that she had 5/5 strength in her legs, was able to stand upright, and was able to walk on her heels and toes. (Tr. 360.) Dr. Taliwal noted that Schneider performed better when she was distracted, indicating self-limitation. (Tr. 21.) Furthermore, Dr. Taliwal encouraged Schneider to become more active and imposed no restrictions on her. (Tr. 360.) By November, 2008, seven months after the second surgery, Dr. Taliwal reported that Schneider's back was doing well and she had a negative SLR bilaterally. (Tr. 233.) More importantly, Schneider herself reported that her back was feeling better. *Id.* Dr. Taliwal's records, being the most recent orthopedic assessments, support the ALJ's determination that Schneider did not need a sit/stand option or require the use of an assistive device.

Moreover, the ALJ's decision regarding Schneider's orthopedic limitations and the RFC calculation noted the reasons why he rejected or discounted the opinions of Dr. Kuschnir, Dr. Esterle, and the state examining doctor as follows:

> On July 11, 2008, the Bureau of Disability Determination concluded that Ms. Schneider retained the residual functional capacity to do a range of light work (Exhibit 415F; see also exhibit 127F (11/6/07: range of medium work)). This assessment takes inadequate account of her back and knee pain and so I do not follow it.
>
> * * *
>
> On June 3, 2008, Dr. Kuschnir was of the opinion that Ms. Schneider could lift 15 pounds and could sit, stand and walk for 6 hours each in 30 to 60 minute increments. She could never climb, stoop, crouch, kneel, crawl, push or pull. She could not work around heights, moving machinery, or temperature extremes. She required a brace, but not a cane or walker (Exhibit 319F). The evidence shows that Ms. Schneider's back and knee pain result in her being more limited than Dr. Kuschnir opined, so I do not follow his opinion.
>
> On June 26, 2008, and December 15, 2008, Dr. Esterle expressed the opinion that Ms. Schneider could not persist in full time work (Exhibits 472F, 609F). This is inconsistent [with] the evidence as a whole, with Ms. Schneider's activities of daily living, with Dr. Kuschnir's opinion, and with Dr. Taliwal's statement that she should "continue to increase activity as tolerated with no restrictions from our end" (Exhibit 477F). Consequently, I do not follow Dr. Esterle's opinion.

13

(Tr. 23-24.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. Appx 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. Appx at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

The ALJ properly considered the Regulations in determining he would not follow the opinions of the other treating doctors.

---

[7] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982). The ALJ properly rejected Dr. Esterle's opinion that Schneider could not work full-time.

Finally, the ALJ also did not place great weight on Dr. Esterle's opinion that Schneider needed a cane for support as Dr. Esterle is a family doctor who prescribed the cane in August, 2007, specifying that it was due to Schneider's anxiety disorder and fear of falling, not to any actual physical need for a cane.[8] (Tr. 828.) There was no evidence that Schneider's treating orthopedists believed she required a cane for support. *See* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (stating that more weight is generally given to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of a source who is not a specialist).

The evidence demonstrates that Schneider did not require a sit/stand option or the use of an assistive device, supporting the ALJ's hypothetical.[9] Schneider's first assignment of error is

---

[8]Dr. Esterle also had noted that Schneider had been prescribed a TENS unit, which according to Schneider, had not been prescribed. (Tr. 1428.)

[9]Even if the ALJ had included a sit/stand option every 15 to 20 minutes, it would not have changed his decision as the VE testified that this limitation would not affect Schneider's ability to perform the jobs identified. (Tr. 1418.)

15

without merit.

### *Credibility and Pain*

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." S.S.R. 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id*. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross*, 373 F. Supp. 2d at 733 (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the

16

regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

Here, the ALJ found that Schneider had medically-determinable impairments that could reasonably be expected to produce the symptoms she claimed. (Tr. 19.) The ALJ, however, found that Schneider's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with his RFC assessment. *Id*.

> The ALJ's decision notes the following statements made by Schneider:
>
> She testified that she has severe back pain that radiates down her legs. Her ability to walk is restricted from both the pain and by a foot drop. She requires a walker or a cane to ambulate, and even then, her leg may just give out on her. She spends a majority of her day laying on a flat, hard surface such as her bed or the floor. She can do chores that require standing, such as doing the dishes, for approximately 15 minutes before she must stop. She can sit up to 20 minutes before she must change position. Ms. Schneider acknowledges a history of alcohol abuse, but testified that she has been sober for approximately one year prior to the date of the hearing.

*Id*.

In discussing Dr. Taliwal's medical records, the ALJ noted his reasoning for finding Schneider's pain allegations not credible:

> On May 14, 2008, Dr. Taliwal noted that Ms. Schneider was making adequate progress a month after surgery, but that she continued to smoke despite his instruction that it would impede union (Exhibit 538F). She slouched but, when corrected, she could stand straight. She was told to do physical therapy. Ms. Schneider attended physical therapy, but not at the frequency prescribed (Exhibit 541F-542F, 560F-571F).
>
> On July 3, 2008, EMS brought Ms. Schneider to the Medina General Hospital emergency department. She complained of low back pain. Paramedics noted that she was able to walk from her second floor apartment to the ambulance. She told emergency department personnel that she had been walking. Her right leg "cramped up." She went home, had a "a glass of wine," and lay down. When she got up, she felt a crack in her back. She was observed to be ambulating. She was given Dilaudid, a narcotic, in the emergency room as well as Phenergan, an anti-nausea drug, and Norflex, a muscle relaxant, in the emergency department and sent home with two Percocet pills (Exhibits 544F-558F).
>
> On July 30, 2008, Dr. Taliwal noted that Ms. Schneider was making slow but steady progress. He also noted, again, that she was using excessive amounts of narcotic medication and "needs to aggressively wean of Kadian and Vicodin." She was able to stand upright and had full strength in her legs. She was able to walk on her heels and toes. He noted that she performed better when she was distracted, indicating self limitation. (Exhibits 477F, 539F).
>
> After she fell in August 2008 due to balance problems, Dr. Taliwal advised her to return to physical therapy (Exhibit 592F). Ms. Schneider discontinued therapy on

17

> September 8, 2008 due to subjective complaints of pain, despite noted progress (Exhibit 600F).

(Tr. 20-21.)  As discussed by the ALJ, the evidence established that Schneider's back problems improved following her second surgery.  In fact, on July 30, 2008, Dr. Taliwal encouraged Schneider to become more active and imposed no restrictions on her.  (Tr. 360.)  In November, 2008, Schneider reported to Dr. Taliwal that her back felt better, and her greater concern was her knees.  (Tr. 233).  Although Dr. Taliwal did not complete an RFC evaluation, the ALJ relied on his opinion and discussed the reasons for doing so.  Dr. Taliwal, being the orthopedic surgeon, was in the best position to assess Schneider's limitations.

Because Schneider's subjective complaints of disabling back pain are inconsistent with the evidence from Schneider's treating orthopedist, Dr. Taliwal, the ALJ's finding that Schneider's pain complaints were not fully credible is supported by substantial evidence.

### *New Evidence - Sentence Six Remand*

Schneider has submitted medical records from Drs. Taliwal and Ross that cover examinations subsequent to her hearing.  She claims that these records contain new, material evidence that warrant a remand as they demonstrate the necessity of a third surgery, her second surgery having not healed properly.  (Doc. No 14 at 17-19.)  The Commissioner contends that Schneider has not met her burden for a sentence six remand.  (Doc. No. 16 at 16-20.)

A sentence six remand is appropriate only where the evidence presented is new, material, and good cause existed for not presenting the evidence in the prior proceeding.  42 U.S.C. § 405(g).  Evidence is new only if it was not in existence or unavailable during the administrative proceeding.  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Evidence is "material" for purposes of sentence six remand if it is time-relevant, *i.e.*, relates to the period on or before the date the ALJ rendered his decision.  *Id; see, e.g., Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003).  Also, evidence is "material" only if there is a reasonable probability that the ALJ would have reached a different conclusion if the evidence had been considered.  *Ferguson,* 628 F.3d at 276; *Foster*, 279 F.3d at 358.  Good cause exists where the failure to present the evidence during the

administrative proceeding was reasonably justified. *Ferguson,* 628 F.3d at 276; *Foster*, 279 F.3d at 357. The claimant bears the burden of establishing that remand is appropriate. *Id*.

Dr. Taliwal's report dated May 6, 2009, pre-dates the ALJ's June 19, 2009 decision, and, therefore, is not "new" within the meaning of sentence six. It also is not material. Even though Dr. Taliwal reported slightly diminished leg strength, he also noted that Schneider made an inconsistent effort, calling into question whether she was really limited. (Tr. 988.) Moreover, Dr. Taliwal did not report any limitations that were inconsistent with Schneider's ability to perform a limited range of sedentary work.

Regarding Dr. Ross' reports dated July 20, 2009, and August 21, 2009, the Appeals Council reviewed this evidence, affirming the ALJ's decision as the "new" evidence contained no information to support a different outcome. In fact, Dr. Ross' examination findings were consistent with the ability to perform a limited range of sedentary work and, therefore, not material.

Lastly, regarding Schneider's June 2, 2010, CT myelogram and the August, 2010, back surgery, the Appeals Council found that these records were new, but concerned a later time and that they could be used by Schneider in her application dated September 25, 2009. (Tr. 3.) Furthermore, the Court finds that there is nothing in these documents establishing that Schneider would no longer be able to perform a limited range of sedentary work after the third surgery. Schneider is not entitled to a sentence six remand.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

                                            s/ Greg White
                                            United States Magistrate Judge

Date: December 19, 2011